IN THE UNITED STATES DISTRICT COURT FOR THE

MIDDLE DISTRICT OF ALABAMA, SOUTHERN DIVISION

| | | |
|---|---|---|
| MARY V. WILLIAMS and<br>TERRENCE D. WILLIAMS<br>MERRIWEATHER,<br>on behalf of themselves<br>and all others similarly<br>situated,<br><br>    Plaintiffs,<br><br>    v.<br><br>NATIONAL SECURITY<br>INSURANCE COMPANY,<br><br>    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CIVIL ACTION NO.<br>1:02cv877-MHT<br>    (WO) |

OPINION

This civil-rights action was brought by three African-American plaintiffs, Mary V. Williams, Terrence D. Williams Merriweather, and Fannie Fields, on behalf of the plaintiffs and a putative class of similarly situated persons.  As last amended, the plaintiffs' complaint claims, among other things, that defendant National Security Insurance Company ("NSIC") violated 42 U.S.C. §§ 1981 and 1982 through racially discriminatory pricing,

design and sale of certain insurance policies in past decades. Specifically, the plaintiffs allege that NSIC violated their civil rights by charging racial minorities higher premiums for the same or similar insurance benefits sold to whites, or by charging racial minorities similar premiums for policies with lower benefits or values, compared to similarly situated whites.

The plaintiffs' claims are asserted individually and on behalf of all African-American policyholders who purchased or have had any legal or beneficial interests in the challenged policies.[1]  This action is now before the court on the parties' joint motion for certification of a mandatory class for settlement purposes only and for approval of a proposed settlement of all claims that could be asserted by members of the stipulated class.

Having considered the submissions of the parties and the totality of the evidence in the record, the court

---

1.  By order dated September 22, 2004 (Doc. No 100), Fannie Fields was dismissed as a party plaintiff.

will grant final approval to the settlement in its entirety.

## I.   FACTUAL BACKGROUND

The representative plaintiffs hold life insurance policies with NSIC, an insurance provider founded in 1947.  NSIC utilized race-distinct dual rates in issuing certain insurance policies.[2]   This practice ended on December 31, 1980.[3]   NSIC has no record of policies lapsing prior to January 1, 1983, after which electronic data for in-force policies is available.[4]

In 2000, the Alabama Department of Insurance ("ALDOI") began investigating NSIC's use of dual rates based on race.  Upon completion of its investigation, ALDOI concluded that the premium differential in NSIC's

_____

2.   Defendant's evidentiary submission in support of settlement (Doc. No. 144), part 10, ALDOI Actuarial Report ("ALDOI report"), p. 3.

3.   Defendant's notice of final settlement (Doc. No. 133), part 4, Affidavit of Doug Martin ("first Martin affidavit"), p. 2.

4.   Id.

dual rates was 27.6 %.[5]   NSIC's actuary, utilizing a different methodology, concluded that the rate differential was 21.4 %.[6]

In a conference call held on September 12, 2002, the possibility of settlement was first discussed with the parties, and NSIC made clear that it could not enter into any settlement other than a global settlement.   The settlement process was begun with mediation conferences before U.S. Magistrate Judge Vanzetta Penn McPherson on March 20, 2003 and April 7, 2003.   The progress of the settlement discussions and the involvement of ALDOI has been the subject of a number of status conferences with the court over the past three years.

---

5.   ALDOI report.

6.   Defendant's notice of final settlement (Doc. No. 133), part 6, Affidavit of Michael Tucker ("Tucker affidavit"), p. 2.

## II.  STRUCTURE OF THE SETTLEMENT

The stipulation of settlement with supporting evidence was filed on December 2, 2005.[7] The court issued a preliminary approval order and preliminary injunction on December 12, 2005, setting a fairness hearing for May 11, 2006.

Through extensive court-approved procedures, class members were notified of their opportunity to object to the settlement, attend the fairness hearing, and obtain additional information by calling toll-free numbers established pursuant to the settlement.  Class members were also informed how to submit claims for relief where required under the settlement.  Certain deficiencies in the publication of notice were corrected through republication after the May 11, 2006 fairness hearing, and a second fairness hearing was held on August 22,

---

7.  Defendant's notice of final settlement (Doc. No. 133) ("settlement stipulation"), part 2.  A stipulation in slightly different form was filed on June 23, 2005 (Doc. No. 123), prior to the ALDOI regulatory settlement (Doc. No. 133), part 3, and similar settlements with Georgia and Mississippi (Doc. No. 142), parts 2 and 3.

5

2006.  No objections to the settlement were received by the parties or by the court at any time.  A large number of claim forms and requests for reinstatement information have been received to date in response to the notice procedure approved by the court.

The settlement stipulation defines the proposed class as follows:

> "All natural persons who ever purchased, paid for, owned, were insured under, or had any ownership, beneficiary, or other legal interest of any kind including estates, legatees and heirs at law of the foregoing in any Race-Distinct Life Insurance, Endowment or Merchandise Burial Insurance Policy, or other Race-Distinct life insurance policy issued or assumed by National Security Insurance Company and insuring a member of a Racial Minority.  Members shall not include Excluded Persons and Entities."

The proposed settlement encompasses policies sold by NSIC to African-Americans pursuant to an explicitly race-distinct pricing structure from 1947 through 1980, according to which African-Americans were charged more than whites or sold policies with lower overall benefits than whites.  As previously noted, ALDOI's consulting

6

actuary concluded that the average premium differential for race-distinct merchandise burial policies in the class at issue was approximately 27.6 %, and NSIC's actuary concluded that the rate differential was 21.4 %.

In August 2000, NSIC declared all in-force policies "paid up" at a cost to the company at the time of $ 750,000. Under the settlement, eligible class members with in-force or extended term race-distinct policies will receive, in addition to the stated benefits of their policies, and payable contemporaneously with payment of policy benefits, an additional settlement benefit of 25 % of the stated policy benefit. The non-forfeiture values of each eligible class member's in-force policy shall be increased by 25 %, all subject to possible adjustment up or down dependant on the number of class policies for which a claim form is filed.

Eligible persons with estate and matured policies will, in addition to benefits already received, receive an additional 25 % benefit, together with 3 % interest,

subject to adjustment as described previously.[8]   These figures approximate and redress the average premium differential found by ALDOI for the policies at issue (the figures exceed the rate differential found by NSIC's actuary).[9]

The settlement also provides that eligible persons whose class policies terminated without benefit may reinstate their policies and obtain the same additional benefit enhancement they would be entitled to if their policies had remained in force.  In addition, reinstated policies will be "paid up."[10]

The settlement establishes procedures for class members to obtain benefits to which they are entitled under the settlement, as well as procedures for the administration of the settlement by NSIC under the supervision of class counsel and the court.[11]   Class

---

8.   Settlement stipulation, pp. 12-14, 17.

9.   ALDOI Report; Tucker affidavit, p. 2.

10.  Settlement stipulation, pp. 13-14.

11.  Id., pp. 33-37.

members may submit claim forms through and including September 19, 2006. Under the settlement, the mandatory claim-in requirement is reasonably limited to persons whose policies are terminated or out of force, and therefore cannot as a practical matter be accurately located or identified at this late date by other practical and efficient means.[12] The settlement further provides that any disputes as to eligibility or entitlement to relief will be submitted to ALDOI for resolution, with review by the court if requested.[13]

All relief under the settlement is subject to a maximum aggregate total of $ 3,243,635.00 and a minimum aggregate total of $ 3,183,966.00 in cash payments or additional reserves to be expended by NSIC.[14] Current costs to NSIC are approximately $ 3.8 million and gross

---

12. Id., pp. 13-16.

13. Id., pp. 15-16.

14. Id., p. 17.

future costs are anticipated to approximate $ 6.9 million).[15]

All categories of relief under the settlement are also subject to minimum payout guarantees, under which any unclaimed balance will be utilized to increase the settlement benefits provided.  Likewise, should the number of claims combined with the amount of automatic relief to the class exceed the maximum amount, settlement benefits to the class will be decreased pro rata.  In short, the settlement gives class members the opportunity to effectively eliminate any race-based differentials in their insurance contracts.

Class counsel have been involved in numerous prior class settlements involving claims similar to those at issue here, including at least two similar class actions in the federal district courts of Alabama.  A class settlement of virtually identical claims on terms similar to the settlement now under consideration was approved in

_____

15. Affidavit of William L. Brunson, Jr. ("Brunson affidavit") (Doc. No. 158), p. 1.

Carnegie v. Mut. Sav. Life Ins. Co., 2004 WL 3715446 (N.D. Ala. 2004) (Smith, J.).  This fact has been given due consideration by the court in its consideration of the settlement calculus.

Finally, although NSIC agreed not to object to class counsel's request for a reasonable fee, which was agreed to be at or below a certain amount, the specific amount to be awarded within that range was left to the court, and even this limited agreement as to fees was not negotiated prior to agreement of the class relief.

In exchange for the benefits to the class, the settlement provides for a release and dismissal of the plaintiffs' and class members' claims and for a permanent injunction against the pursuit of similar claims.[16]  The following cases are to be dismissed with prejudice:

> 1.  Cassie Anglin, et al. v. National Security Insurance Company, Circuit Court of Henry County, Alabama, Civil Action No.: 2001-043.
>
> 2.  Sarah N. Bennett, et al. v. National Security Insurance Company,

---

16. Settlement stipulation, pp. 29-31.

U.S. District Court, Middle District of
Alabama, Northern Division, Civil Action
No.: 01-D-1493-N.

3. Catherine Biggers, et al. v.
National Security Insurance Company,
Circuit Court of Bullock County,
Alabama, Civil Action No.: 2001-54.

4. Willie Bryant, et al. v. National
Security Insurance Company, Circuit
Court of Macon County, Alabama, Civil
Action No.: 01-093.

5. Lillie Conway v. National Security
Insurance Company, U.S. District Court,
Middle District of Alabama, Northern
Division; Civil Action No.: 02-D-262-E.

6. Gussie Curry, et al. v. National
Security Insurance Company, Circuit
Court of Barbour County, Clayton
Division, Civil Action No.: 01-054.

7. Sallie Echols v. National Security
Insurance Company, U.S. District Court
for the Middle District of Alabama,
Northern Division, Civil Action No.: 02-
D-386-N.

8. Clara Flakes v. National Security
Insurance Company, U.S. District Court,
Middle District of Alabama, Northern
Division; Civil Action No.: 02-D-263-E.

9. Annie Floyd v. National Security
Insurance Company, U.S. District Court,
Middle District of Alabama, Northern
Division; Civil Action No.: 02-D-251-N.

12

10.  Gatra Freeman Ivery; Celia O'Bryant
v. National Security Insurance Company,
U.S. District Court, Middle District of
Alabama, Northern Division; Civil Action
No.: 02-D-246-N.

11.  Jessie Ivey v. National Security
Insurance Company, U.S. District Court,
Middle District of Alabama, Northern
Division; Civil Action No.: 02-D-257-N.

12.  K.C. Jones, et al. v. National
Security Insurance Company, Circuit
Court of Chambers County, Alabama, Civil
Action No.: 01-098/

13.  Annie Martin v. National Security
Insurance Company, U.S. District Court,
Middle District of Alabama, Northern
Division; Civil Action No.: 02-D-256-N.

14.  Jimmie M. O'Neal v. National
Security Insurance Company, U.S.
District Court, Middle District of
Alabama, Northern Division; Civil Action
No.: 02-D-255-N.

15.  Annette Peterson; Mary Lee Peterson
v. National Security Insurance Company,
U.S. District Court, Middle District of
Alabama, Northern Division; Civil Action
No.: 02-D-247-N.

16.  Arthur Peterson, et al. v. National
Security Insurance Company, U.S.
District Court, Middle District of
Alabama, Northern Division; Civil Action
No.: 02-D-248-N.

17.  Annie M. Smith v. National Security Insurance Company, U.S. District Court, Middle District of Alabama, Northern Division; Civil Action No.: 02-D-261-E.

18.  Daisy Varner, et al. v. National Security Insurance Company, U.S. District Court, Middle District of Alabama, Northern Division; Civil Action No.: 02-D-252-N.

19.  Willie J. Johnson v. National Security Insurance Company, U.S. District Court, Northern District of Alabama, Southern Division, Civil Action No.: 02-J-2169-S.


III.  NOTICE

Prior to the May 11, 2006, fairness hearing, the parties complied with all aspects of the notice requirements except with respect to section 5C of the settlement stipulation requiring publication in certain newspapers.[17]   On May 12, 2006, the court ordered the

_____

17.  The settlement stipulation and preliminary order required publication in the following newspapers: Atlanta Voice, Birmingham News/Birmingham Post-Herald (two separate newspapers), The Birmingham Times, Columbus Ledger-Enquirer, The Columbus Times, Dothan Eagle, Elba Clipper, Enterprise Ledger, Gadsden Times, Greene County Democrat, Hattiesburg American, Jackson Advocate, Mobile
(continued...)

publication of a revised version of the notice in the newspapers listed at Exhibit I of the settlement stipulation to be completed on or before June 30, 2006, and for the adjournment of the fairness hearing to August 22, 2006.

The parties submitted an affidavit showing that notice had been published in all newspapers, save one, in accordance with the settlement and this court's order of May 12, 2006.[18]  Upon motion and explanation of the failure to obtain publication in the Montgomery-Tuskegee Times, the court amended its previous orders to exclude that newspaper.[19]  The parties also mailed court-approved notice to all class members for whom NSIC has a valid current address in its master file records.  11,438 notice packages were mailed.  The parties were also able

---

17. (...continued)
Press/Mobile Register (two separate newspapers), Mobile Beacon, Montgomery Advertiser, Montgomery-Tuskegee Times, Memphis Silver Star News, Opelika-Auburn News.

18. Affidavit of Galen McWaters (Doc. No. 155), part 2.

19. Doc. No. 156.

to determine current addresses and remail all returned notice packages.

The mailed notices and newspaper publication was supplemented by posting summary notice on NSIC's website. Further, 15 NSIC agents delivered 586 notice cards identified at exhibit G of the stipulation to the homes of persons with ownership interests in one or more policies covered by the settlement living in and around Opelika, Lafayette, Lanett, Valley, Phenix City, Troy, Enterprise, Opp, Greensboro, Sawyerville, Newbern, Uniontown, Glenwood, Auburn, Georgiana, Brundidge, Ozark, Skipperville, Headland, Newville, Abbeville, Banks, Ariton, Elba, Dozier, Brantley, Luverne, Highland Home, Grady, Roanoke, Waverly, Forest Home, Pineapple, Camden, Greenville, Alberta, Silas, Millry, Dothan, New Brockton, Minter, Salem, Pinehill, Union Springs, Tuskegee, Seale, and Smiths Station.[20]

The notice program was administrated by the NSIC settlement administration center in Elba, Alabama.   The

_____

20. Affidavit of Doug Martin (Doc. No. 150), part 2.

16

notice program and general settlement administration has cost $ 94,179.91 as of July 31, 2006, comprising $ 23,114.11 for newspaper publications, $ 14,272.00 for printing and mailing notice packages, and $ 56,793.80 for payroll expenses for employees of the settlement administration center.[21]

The court finds that the mailed, published, and personally delivered notices were reasonably calculated under all of the circumstances to: (1) inform interested parties of the essential terms of the proposed settlement; (2) explain how (and where) additional information on the detailed terms of settlement could be obtained; and, (3) afford class members reasonable opportunity to present objections to the terms of settlement. The notices satisfactorily conveyed to class members all information relevant to an informed decision. The court therefore finds that the notice procedure as implemented was the best notice practicable under the circumstances, accorded constitutional due process, and

---

21. Brunson affidavit, p. 1.

17

complied with the requirements of Rule 23(e)(1)(B) of the Federal Rules of Civil Procedure.

## IV.  FAIRNESS HEARINGS

At the fairness hearings of May 11, 2006 and August 22, 2006, the court heard oral argument from class counsel and counsel for the defendant, and all class members were provided an opportunity to be heard and to submit evidence in support of or in opposition to the proposed settlement. Despite the extensive notice efforts, no member of the proposed class objected to the proposed settlement or otherwise identified any defect in the settlement, either procedurally or substantively.

## V. CLASS CERTIFICATION

Rule 23 of the Federal Rules of Civil Procedure governs the certification of class actions. District courts are required to conduct a rigorous analysis of that rule's requirements, even when presented with a

request for settlement-only class certification.  <u>Amchem</u>
<u>Products, Inc. v. Windsor</u>, 521 U.S. 591, 620 (1997).

In its order of December 12, 2005, preliminarily
approving the settlement, the court found that the
plaintiffs had satisfied each of the four Rule 23(a)
requirements: (1) numerosity; 2) commonality; (3)
typicality; and (4) adequacy of representation.  As a
result, the court conditionally certified the class for
settlement purposes pursuant to Fed.R.Civ.P. 23(b)(1)(B)
and (b)(2).  The court incorporates by reference its
prior findings and conclusions as to the propriety of
class certification under Rule 23(a), and now turns to
the question of whether final certification is
appropriate under the specific provisions of Rule
23(b)(1)(B) and (b)(2).


                    1. Certification under
                    Fed.R.Civ.P. 23(b)(1)(B)

Rule 23(b)(1)(B) provides, in relevant part, that a
class action may be maintained if the prosecution of

19

separate actions by individual members of the class would create a risk of adjudications that would "as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests."  Among the varieties of suit traditionally encompassed by Rule 23(b)(1)(B) are those involving a 'limited fund,' in which numerous individual claims against an insufficient fund would impair the ability of all members of the class to protect their interests. Ortiz v. Fibreboard Corp., 527 U.S. 815, 834 (U.S. 1999).

The Ortiz court reversed the certification of a mandatory 23(b)(1)(B) class of plaintiffs suffering from exposure to asbestos, finding that certain premises essential to maintain such an action were unsupported in the record.  Specifically, the record showed (1) no evidence of the inadequacy of the fund to pay all claims, other than the agreement of the parties; (2) that potential claimants were not treated equitably among themselves; and (3) that the defendant (as opposed to its

insurers) made only a de minimus contribution to the settlement, retaining virtually its entire net worth. In an action to certify a mandatory class under a 23(b)(1)(B) limited-fund theory, "the settling parties must present not only their agreement, but evidence on which the district court may ascertain the limit and the insufficiency of the fund." Ortiz, 527 U.S. at 849.

The uncontested evidence presented by the parties in the case at bar shows that individual adjudications of claims against NSIC definitely create the risk that the rights of non-parties could be disposed of, impaired or impeded by the probable insolvency of NSIC. NSIC's surplus as of December 31, 2005, was $ 9,930,651.00.[22] The proposed settlement reduces NSIC's surplus by approximately 35 %.[23]  Twenty individual lawsuits involving 174 plaintiffs are currently pending against

_____

22. Defendant's evidentiary submission in support of settlement (Doc. No. 144), part 11, NSIC annual statement, p. 4.

23. Defendant's notice of Final Settlement (Doc. No. 133), part 5, Affidavit of Terry Long, pp. 4-8; part 9, Affidavit of David Parsons ("Parsons affidavit"), p. 2.

NSIC in five Alabama counties and in this court.[24]
Attorneys for the plaintiffs in these cases represent an
additional 835 plaintiffs.[25]   The reasonable costs of
defending these claims has been estimated at
$ 48,910,125.00.[26]

Because NSIC is an insurance company with future
obligations to policyholders, its solvency is regulated
by ALDOI.[27]   ALDOI initiated an investigation into the
subject matter of this lawsuit in 2000 and has carefully
monitored the subject litigation and settlement.   ALDOI
Deputy Commissioner David Parsons and Commissioner Albert
Bell have approved the settlement with respect to both

---

24. Defendant's evidentiary submission in support of
settlement (Doc. No. 144), part 14, Affidavit of Clement
Clay Torbert, Jr, pp. 6-9.

25. Id., part 13, Affidavits of Gibson Vance, et al.

26. Doc 144, Part 14.

27. Parsons affidavit, pp. 1-2; Ala. Code §27-21-1 et
seq. ; Ala. Admin. Code r. 482-1-101 (ALDOI Reg. 101).

fairness to the class and NSIC's continuing solvency.[28]

According to Parsons:

> "One of the obvious signs which concern regulators from the standpoint of solvency is a large reduction in surplus. The subject proposed settlement involves a cost to NSIC of in excess of 30 % of its surplus. In the context of solvency regulation, this cost is very large in relation to the surplus of NSIC and is a matter for concern. The cost of this settlement is definitely material to the solvency of NSIC but does not require that it be placed under supervision. A further material negative development could well affect its surplus, its financial viability and its ability to continue in business, not to mention the performance of its obligations under the subject proposed settlement... ALDOI considers the non opt-out feature of this settlement to be essential because the cost of defense of numerous individual cases or the imposition of a large verdict, could require that ALDOI place this company under supervision or in receivership."[29]

---

28. Defendant's notice of Final Settlement (Doc. No. 133), part 7, Affidavit of Walter Bell; part 9, Parson's affidavit.

29. Parson's affidavit, pp. 2-3.

As set forth in the regulatory settlement reached in this case with the state of Alabama, ALDOI has declined to impose additional sanctions against NSIC, precisely because of concerns over the company's continuing solvency:

> "Both the direct and indirect costs to National Security of the implementation of the measures called for by the Stipulation will be substantial. Any additional sanctions imposed by the Department against NSIC would not be in the best interests of NSIC, its current or former policyholders, the consumers of this state, or the State of Alabama."[30]

The prosecution of separate actions against NSIC unquestionably creates a risk of adjudications that, as a practical matter, would be dispositive of the interests of class members not parties to the adjudications or would substantially impair or impede their ability to protect their interests. The settlement was reached through arms-length negotiations between non-conflicted

---

30. Defendant's notice of Final Settlement (Doc. No. 133), part 3, Regulatory Settlement Agreement and Consent Order, p. 2.

parties, and is supported by ALDOI's independent review. Therefore, the court finds that the protection afforded by 23(b)(1)(B) is necessary to protect absent class members and accomplish the settlement proposed, and certification of the class pursuant to Rule 23(b)(1)(B) is warranted.

### 2.Certification under Fed.R.Civ.P. 23(b)(2)

Class certification under Rule 23(b)(2) is appropriate where "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed.R.Civ.P. 23(b)(2). Two basic requirements must be met: (1) the class members must have been harmed in essentially the same way by the defendant's acts; and (2) the common injury may properly be addressed by class-wide injunctive or equitable remedies. Holmes v. Continental Can Co., 706 F.2d 1144,

1155 (11th Cir. 1983) ("[T]he claims contemplated in a (b)(2) action are <u>class</u> claims, claims resting on the same grounds and applying more or less equally to all members of the class.") (emphasis in original).

Where these two requirements are met, the class members' interests are sufficiently cohesive that absent members will be adequately represented. <u>Id</u>. at 1155 n.8 ("[T]he (b)(2) class is distinguished from the (b)(3) class by class cohesiveness. ... Injuries remedied through (b)(2) actions are really group, as opposed to individual injuries."); <u>Lemon v. International Union of Operating Engineers, Local No. 139, AFL-CIO</u>, 216 F.3d 577, 580 (7th Cir. 2000) ("Rule 23(b)(2) operates under the presumption that the interests of the class members are cohesive and homogeneous such that the case will not depend on the adjudication of facts particular to any subset of the class nor require a remedy that differentiates materially among class members.")

While class certification under Rule 23(b)(2) is not limited to the context of civil rights, "[c]ivil rights

cases against parties charged with unlawful, class-based discrimination are prime examples" of Rule 23(b)(2) class actions.  <u>Amchem Prods. v. Windsor</u>, 521 U.S. 591, 614 (1997).  Here, NCIS's alleged conduct, directed against and uniformly harming a specific class of people, falls squarely within the ambit of Rule 23(b)(2).

ALDOI concluded that, between 1964 and 1980, NSIC marketed industrial life insurance using premium structures that explicitly reflected higher rates for African-Americans than for Caucasians.  Prior to 1964, industrial cost premium classifications had the effect of creating rate distinctions based on race.[31]  NSIC's internal documents and admissions of management also indicate the use of race-distinct dual rates.

Whether policies sold to African-Americans were objectively more costly and inferior than comparable policies sold to Caucasians is an objective, common question provable on a class-wide basis.  The class is

---

31. ALDOI report, pp. 14-15.

cohesive because all members have been affected in the same way by NSIC's practices.

Rule 23(b)(2) contemplates class cases seeking equitable injunctive or declaratory relief, but monetary relief does not conflict with the limitations of the Rule when it "is not in the nature of a claim for damages, but rather is an integral part of the statutory equitable remedy, to be determined through the exercise of the court's discretion." Holmes, 706 F.2d at 1152 (finding an award of back pay to be a remedy within the ambit of Rule 23(b)(2)) (quoting Johnson v. Georgia Highway Express, 417 F.2d 1122, 1125 (5th Cir.1969)). Here, the plaintiffs seek "make whole" equitable group remedies, similar to back pay, that flow directly from a finding of liability to the class as a whole.

According to the settlement, the class is automatically entitled to reformation of the policies to equalize the disparity in death benefits and to disgorgement and a distribution of the discriminatory overcharges and death benefit shortages on policies

terminated by death.  Moreover, the amount of overpayment
or increase in death benefits is objectively calculable
without reference to each class member's individual
circumstances.  As stated in the settlement agreement,
the proposed remedies can and will be made in an
objective, class-wide fashion.  The injunctive and
equitable "make whole" remedies sought by the plaintiffs
and included in the settlement will provide the most
appropriate relief for the class members' common injury.

The court has broad, equitable authority under 42
U.S.C. §§ 1981 and 1982 to enjoin long-standing,
systemic, racially discriminatory conduct and grant
restitution to victims.  Indeed, "[w]here racial
discrimination is concerned, 'the [district] court has
not merely the power but the duty to render a decree
which will so far as possible eliminate the
discriminatory effects of the past as well as bar like
discrimination in the future.'" Albemarle Paper Co. v.
Moody, 422 U.S. 405, 418 (1978).  Here, the agreed-upon
equitable relief in the settlement--an injunction

requiring NSIC to reform the race-distinct policies so as to enhance benefits to a non-discriminatory level--is properly certified via Rule 23(b)(2) and does not destroy the cohesiveness of the class.

## VI. THE SETTLEMENT IS FAIR AND REASONABLE

Settlement is generally favored as a means of resolving class-action lawsuits. Bennett v. Behring Corp., 737 F.2d 982, 986 (11th Cir. 1984). However, the district court bears the heavy responsibility of ensuring that the proposed settlement is fair, reasonable, and adequate as to the entire plaintiff class, and not the product of fraud or collusion. Piambino v. Bailey, 757 F.2d 1112, 1139 (11th Cir. 1985), cert. denied, 476 U.S. 1169 (1986); Bennett, 737 F.2d at 986.

In reaching conclusions about the fairness, adequacy, and reasonableness of a settlement, a court should examine several factors, including: (1) the complexity, expense and likely duration of the litigation; (2) the probability of the plaintiffs' success on the merits; (3)

30

the stage of the proceedings and the amount of discovery completed; (4) the range of possible recovery; (5) the existence of fraud or collusion behind the settlement; and (6) the opinions of class counsel, class representatives and the substance and amount of opposition to the settlement. <u>Leverso v. Lieberman</u>, 18 F.3d 1527, 1530-31 n. 6 (11th Cir. 1994). Full consideration of these factors demonstrates that this settlement is fair, reasonable and adequate for the members of the plaintiff class.

In order to succeed at trial, the plaintiffs would have attempted to show that, among other things, NSIC intentionally charged African-Americans more than similarly situated Caucasians for insurance coverage, marketed its policies in such a way to conceal this disparity, utilized flawed mortality tables to further conceal discriminatory practices, and uniformly withheld benefits to which class members were entitled. The plaintiffs would also have had to refute a number of NSIC's affirmative defenses, including: (1) the claims

are barred by the applicable statutes of limitations; (2) the plaintiffs lack standing on certain of their claims; (3) NSIC's conduct was actuarily justified; (4) the claims are preempted; and (5) claims under §§ 1981 and 1982 do not survive death. Throughout this litigation, NSIC has argued that it was justified in considering race in underwriting insurance policies based on accepted and appropriate mortality tables and that its practices were approved by state insurance regulators.

Considerable and complex evidence would be required to prove the claims in this case. Proof of NSIC's alleged long history of discriminatory pricing would necessitate the introduction of perhaps hundreds of pages of documentary evidence, and very few living agents or managers for NSIC could testify about the genesis of NSIC's decisions. Actuarial and other expert testimony would be needed to provide a proper frame of reference for many of the documents that would be introduced at trial, and NSIC would naturally have the right to present expert testimony to rebut the plaintiffs' case.

32

Even if a positive outcome for the class at the trial level is assumed, it would almost certainly result in an appeal to the Eleventh Circuit Court of Appeals. At least several months, and perhaps years, would pass between the trial and the entry of a final appellate opinion. This delay would be detrimental to the interests of the class, many of whom are elderly.

Not least, there is a substantial and documented risk that continued litigation of this case and various individual cases would result in NSIC's insolvency, thus denying class members any increase in policy benefits pursuant to the settlement and a probable loss of existing benefits as they now exist. The complexity, expense and expected duration of the litigation weigh in favor of approving the settlement.

With respect to the stage of the proceedings and the amount of discovery completed, "[t]here is no precise yardstick to measure the amount of litigation that the parties should conduct before settling." In re Rio Hair Naturalizer Prods. Liab. Litig., 1996 WL 780512, at *13

(E.D. Mich. 1996) (Rosen, J.).  Even settlements reached at a very early stage and prior to formal discovery may be approved where the settlement represents substantial concessions by both sides and there is no evidence of collusion.  <u>D'Amato v. Deutsche Bank</u>, 236 F.3d 78, 87 (2d Cir. 2001).

The proposed settlement in this case was reached after more than five years of hard fought litigation, during which the parties produced many documents, took numerous depositions, and contested motions for class certification and summary judgment.  The litigation has reached an advanced stage, resulting in sufficient discovery by the plaintiffs to assure the ability to "weigh[] their position based on a full consideration of possibilities facing them."  <u>Klein ex rel. Ira v. PDG Remediation, Inc.</u>, 1999 WL 38179, at *2-3 (S.D.N.Y. 1999) (Batts, J.).  Extensive discovery ensured that plaintiffs' counsel was fully informed in negotiating a reasonable compromise and assessing the fairness of the proposed settlement.  The amount of discovery completed

34

in this case weighs heavily in favor of approving the settlement.

With respect to the range of possible recovery, the benefits provided under the proposed settlement, both in terms of injunctive and monetary relief, are consistent with the relief that the class members could expect to receive at trial, should they prevail.   The insurance premium rate differential uncovered in this case is between 21.4 % and 27.6 %.   The 25 % increased benefit under the settlement is arguably a complete compensation of the class members.[32]   Additional class benefits which have substantial value but which are not included in the 25 % benefit are: (1) declaring all policies paid up; (2) the right to reinstate lapsed policies without underwriting; (3) payment of attorneys' fees and expenses; and (4) administration of the settlement.   The range of recovery, therefore, also weighs in favor of approving the settlement.

_____

32. Under the terms of the settlement, the enhancement may increase or decrease depending on the number of policyholders who claim in.

35

The record demonstrates that the settlement was negotiated by capable, experienced counsel in good faith and at arms' length, following extensive, lengthy and difficult negotiations beginning with court mediation and with the participation of ALDOI.  Accordingly, the Court finds no evidence of fraud or collusion in the settlement negotiations or the resulting proposed settlement.

Finally, the reaction of the class to the settlement has not been antagonistic.  In fact, no objection to the settlement has been filed after an extensive notice program which included mailing notice, publishing advertisements and summary notice in 19 newspapers, posting notice on NSIC's website, and distributing summary notice cards to individual homes.

In short, the settlement eliminates the risk of litigation for the class while providing immediate and fair redress for the premium differentials at issue in this action.  It further provides fair and appropriate procedures for class members to obtain benefits to which they are entitled under the settlement, and includes

detailed procedures for the administration of the settlement by NSIC under the supervision of class counsel and the court.[33]

All factors weigh in favor of class action settlement as a resolution of this litigation, and the court finds that the proposed settlement is fair, adequate and reasonable, and not the product of fraud or collusion.

## VII. INCENTIVE AWARDS

Class counsel request that the court grant representative plaintiffs Mary V. Williams and Terrence D. Williams Merriweather each an incentive award of $ 5,000 for the time and effort they devoted in pursuing this litigation. Counsel also request that a smaller incentive award of $ 2,500 be granted to Fannie Fields for the time and effort she devoted pursuing this litigation.[34] Here, such a distribution is patently fair.

---

33. Settlement stipulation, pp. 33-37.

34. Ms. Fields's claims were dismissed from this action on September 22, 2004, but she expended (continued...)

The record reflects that each plaintiff had extensive personal involvement in bringing to light facts leading to this lawsuit and participated in the litigation process, including sitting for deposition and consulting with class counsel.   Mary V. Williams, Terrence D. Williams Merriweather and Fannie Fields's willingness to pursue this action on behalf of other African-American policyholders with few financial resources of their own was a necessary means of creating the benefit conferred on the entire class.   Given these and other efforts in advancing the litigation, it is fair and reasonable to accord Mary V. Williams, Terrence D. Williams Merriweather and Fannie Fields these modest incentive awards.

## VIII. ATTORNEYS' FEES

At the fairness hearing in support of the parties' motion, attorneys' fees were sought and justified.   Had

---

34. (...continued)
substantial time conferring with class counsel and preparing and sitting for deposition.

the plaintiffs prevailed at trial, 42 U.S.C. § 1988 would have permitted the shifting of fees and costs entirely to NSIC.  Counsel for the plaintiffs have asked for a fee of $ 523,000, including all past and future costs and expenses for themselves and their experts and consultants.  The fee award sought in this case is more than justified under either a lodestar or a common-fund analysis.

The plaintiffs' lodestar fee calculation is currently $ 775,534.50, and the plaintiffs have incurred expenses of $ 78,284.76.  The requested fee and expense award is therefore less than 62 % of the actual fees and expenses incurred in this action to date, and the request is reasonable under a lodestar approach.

Under a common fund approach, class attorneys are entitled to an award of fees and expenses based on a reasonable percentage of the common fund created for the class by their efforts.  <u>Camden I Condominium Ass'n v. Dunkle</u>, 946 F.2d 768, 771 (11th Cir. 1991).  While there is "no hard and fast rule mandating a certain percentage

of a common fund which may reasonably be awarded as a
fee... the majority of common fund fee awards fall
between 20 % to 30 % of the fund." <u>Dunkle</u>, 946 F.2d at
774.

The court finds that the total value of this
settlement to the class is at least $ 6 million,
exclusive of the injunctive relief, the fees and expenses
sought, and administration costs.  The benefit to the
class also includes the $ 523,000 negotiated fee to class
counsel and the thousands of dollars in costs incurred by
NSIC thus far in administering the settlement, bringing
the total benefit to approximately $ 6,900,000.  To the
extent the reserves currently expended by NSIC under the
settlement will purchase even larger death benefits to be
paid in the future, the value of the settlement is higher
still.

Thus, the total of the attorneys' fees and expenses
represents at most 8 % of the aggregate settlement
benefits.  Because the plaintiffs incurred $ 78,284.50 in
expenses during the prosecution of this action, the

actual fee award is $ 444,715.50, representing 6 % of the benefit bestowed on the class members, even without consideration of the injunctive relief.  In other words, the fee requested by the class attorneys is well below the average acceptable range of such awards.

In addition to the size of the award compared to the fund, various other factors weigh in favor of approving the negotiated fee.  Considerations relevant for setting and evaluating percentage fee awards in common fund cases include the twelve factors set forth in <u>Johnson v. Georgia Highway Express, Inc</u>., 488 F.2d 714, 717-19 (5th Cir.1974) in the context of statutory fee awards: (1) the time and labor involved; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and

41

ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

The Eleventh Circuit has identified other pertinent factors, including "the time required to reach a settlement, whether there are any substantial objections by class members or other parties to the settlement terms or the fees requested by counsel, any non-monetary benefits conferred upon the class by the settlement, and the economics involved in prosecuting a class action. Dunkle, 946 F.2d at 775. However, "the most critical factor is the degree of success obtained." Hensley v. Eckerhart, 461 U.S. 424, 436 (1983).

Here, class counsel undertook this litigation on a purely contingent basis, thereby bearing the risk of non-recovery, and expended resources in prosecuting the action both in terms of out-of-pocket costs and hours of attorney time. The relief obtained as a result of the settlement in this case may exceed that which the class

42

members could expect to receive at trial, should they
prevail.   In addition to "make-whole" relief, the
settlement confers non-monetary benefits on the class in
the form of injunctive relief.   Not least, the
settlement, in bringing to light and redressing alleged
racially discriminatory practices, furthers the worthy
goal of eradicating racism and its vestiges in this
country.

Finally, the court notes that class counsel's efforts
on behalf of the class are not over.   The claim-in
deadline for participation in the settlement is September
19, 2006.   As the settlement is implemented, class
members will inevitably have questions and raise issues,
and counsel will be called upon to answer questions
concerning claims for many months.   Finally, throughout
implementation of the settlement, class counsel must
verify that NSIC has met its continuing obligations.
Future expenses incurred by class counsel in this task
will not be compensated.   No objection has been raised to
the fee request, and the request is entirely consistent

43

with a reasonable fee award under the circumstances of the case.  The court finds that the attorneys' fees and expenses sought in this case are fair and reasonable.


IX.  CONCLUSION

For the forgoing reasons, the parties' joint motion for certification of a mandatory class for settlement purposes only and for approval of a proposed settlement of all claims that could be asserted by members of the stipulated class should be granted in its entirety.  All who worked at putting this settlement together (in particular, Magistrate Judge McPherson, who put in tireless hours with counsel for the parties) are to be commended.

An appropriate judgment and injunction will be entered.

DONE, this the 30th day of August, 2006.


                         /s/  Myron  H.  Thompson
                        UNITED  STATES  DISTRICT  JUDGE